IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF WEST VIRGINIA

HAZEL YVONNE SAUNDERS and
SHARON L. ROGERS,

                Plaintiffs,

v.                                    Civil Action No. 1:04cv34

VERIZON COMMUNICATIONS INC. and
VERIZON WEST VIRGINIA, INC.,

                Defendants.

<u>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

The defendants, Verizon Communications, Inc. and Verizon West Virginia, Inc.'s (collectively, "Verizon"), motion for summary judgment is pending and ripe for decision. For the reasons that follow, the Court **GRANTS** Verizon's motion for summary judgment (dkt no. 72) and **DISMISSES WITH PREJUDICE** the plaintiffs' complaint.

## I. STATEMENT OF FACTS

Verizon's Income Security Plan ("ISP") is an employee benefit plan covered by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1132 <u>et</u> <u>seq</u>. The summary plan description ("SPD") for the ISP states that the plan is designed to provide payments to eligible employees who accept a voluntary offer to separate from service when Verizon determines that certain jobs

<u>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

must be reduced or eliminated. (Saunders at 527);(Rogers at 512.)[1]

In certain circumstances, Verizon also offers Enhanced ISP ("EISP")

benefits in lieu of the standard benefits under the ISP.  With

respect to EISP, the SPD states:

**Other Circumstances in Which Benefits Could Be Paid:**

Based on separate provisions under bargaining agreements,
the terms of the Plan are supplemented by certain
provisions of applicable collective bargaining agreements
pertaining to force adjustment, layoff, part-timing,
bumping and rehiring after layoff.  Two examples of such
provisions are:

- Enhanced ISP (EISP): Prior to proceeding
to a layoff resulting from a surplus in
any particular title, location and work
group, the companies will offer an
Enhanced Income Security Plan (EISP)
termination allowance in the surplus
title and location.  The companies may
also offer an EISP in other circumstances
if they choose to do so (IBEW), or when
the ISP may be offered (CWA). The
companies may set limits on the number of
ISP applications they are willing to
accept, and this EISP offer would be in
lieu of obligations, if any, the
companies may have to offer regular ISP.

(Saunders at 540);(Rogers at 525.)

    In 2003, the plaintiffs, Hazel Saunders and Sharon Rogers

("the Plaintiffs"), were employed as Consultants in Verizon's

---

[1] Because this case involves two administrative records, the Court will
cite to each specific administrative record by using the plaintiff's last name
and the last three numbers of the bates number for the particular page in that
administrative record.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Clarksburg, West Virginia work location and both were covered by the ISP.    On June 12, 2003, via an e-mail, Verizon informed its employees that, despite an earlier EISP offer in 2003, the company would extend a voluntary separation offer to additional eligible associates, including those on a list of potential volunteers identified by the union, to further reduce a surplus in the Potomac area.  (Rogers at 63.)  The e-mail explained that the Potomac area included Maryland, Virginia, West Virginia, and the District of Columbia. (_Id_.)  It further advised that the volunteer period would be open from June 17 until July 16, 2003. (_Id_.)

Accordingly, on June 17, 2003, the Plaintiffs received an EISP offer package from Verizon.  The June 17, 2003 EISP offer letter specifically stated:

> This is to inform you that your job is in a work group that is subject to a force adjustment.    The Company, therefore, is offering you the opportunity to elect to leave the service of the Company and receive EISP benefits pursuant to the provisions in the collective bargaining agreement.  You should understand that EISP elections will be granted to the extent necessary to relieve the surplus, in the order of seniority among those eligible employees.
>
> The start date of this EISP offer will be June 17, 2003 and the date the EISP closes will be July 16, 2003.  If you volunteer to leave under the terms of this EISP offer, and you are accepted, your last day on active payroll will be July 26, 2003.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

(Saunders at 21);(Rogers at 20.)  The letter further advised that the offer package was prepared to provide employees with "a brief summary of the plans and benefits regarding the ISP," but that "all rights and/or obligations under the ISP [would] be governed by the collective bargaining agreements, and plan descriptions covering that benefit." (<u>Id</u>.)

One day after the EISP offer was presented to her, Plaintiff Saunders submitted her "Employee Volunteer Form." (Saunders at 127.)  Nearly one month after the date of the offer, on July 11, 2003, Plaintiff Rogers submitted her "Employee Volunteer Form." (Rogers at 98.)   Both Plaintiffs selected the first option on their respective forms, which states:

> I wish to accept the provisions of the EISP
> Income Security Plan and understand that my
> termination Date will be July 26, 2006. . . .

(Saunders at 127);(Rogers at 98.) The Plaintiffs, however, selected different payment options, with Plaintiff Rogers requesting an initial lump sum payment of half of the EISP benefits and Plaintiff Saunders requesting 48 monthly payments beginning the month following her separation from employment.  (<u>Id</u>.) Each Plaintiff signed and dated their respective "Employee Volunteer Form" directly under the following paragraph:

> I have reviewed the provisions and amounts
> available under EISP. I understand that I can

4

> revoke this election on or before the end of
> the 30-day period which began on June 17,
> 2003, but I cannot revoke my decision after
> July 16, 2003, which is the end of the 30-day
> election period. I understand that I may not
> be accepted for the EISP if more senior
> employees who volunteer to participate relieve
> surplus. I further understand that the terms
> and conditions of the Agreement apply.

(<u>Id</u>.)

Saunders' last day of service was July 18, 2003, and Rogers'
last day of service was July 25, 2003. (Saunders at 68);(Rogers at
61.) Verizon, however, ultimately informed the Plaintiffs that,
based on their seniority and because more employees had volunteered
than were necessary to relieve the surplus, their EISP offers had
not been granted. (Saunders at 128);(Rogers at 95.)

In August, 2003, the Communications Workers of America ("CWA")
filed a grievance on behalf of the Plaintiffs, asserting that
Verizon had improperly denied their EISP applications and had
improperly accepted applications of employees with less seniority.
(Saunders at 163-78);(Rogers at 102-115.)     Verizon ultimately
denied the CWA's grievance.   (Saunders at 162);(Rogers at 101.)

## II. PROCEDURAL HISTORY

On March 2, 2004, the Plaintiffs filed this lawsuit against
Verizon, in which they allege that, by denying their voluntary
election and accepting the applications of other employees with

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

less seniority, Verizon breached the terms of the EISP offered in

July, 2003.  They also alleged that Verizon breached its fiduciary

duty under ERISA by failing to inform them before they retired that

it was "seriously considering" a third EISP for that same year.

The Plaintiffs asserted that, had Verizon informed them that

another "volunteer period" would be offered in October, 2003, they

would have delayed their retirement and applied for the third EISP.

On May 3, 2004, Verizon filed a motion to dismiss the

Plaintiffs' complaint based on their alleged failure to exhaust

their administrative remedies.  On the same day, after counsel for

the Plaintiffs had declined repeated requests to submit their

claims through Verizon's claims and appeals process, Verizon

decided to treat the Plaintiffs' complaint as a claim for EISP

benefits and forwarded it to the Verizon Claims Review Unit

("VCRU") for initial determination.   By separate letters dated

November 16, 2004, the VCRU concluded that neither Plaintiff was

eligible for EISP benefits. (Saunders at 58-64);(Rogers at 51-57.)

In these denial letters, the Plaintiffs were informed that they

could appeal their denials to the Verizon Claims Review Committee

("VCRC"), and were invited to submit any additional information

relevant to their claims for the VCRC's consideration. (<u>Id</u>.)   On

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

March 14, 2005, the VCRC affirmed the denial of the Plaintiffs'
claims. (Saunders at 1-10);(Rogers at 1-9.)

On November 23, 2004, the Court ordered the parties to file
briefs on the status of any administrative remedy in this case and
allowed them to conduct limited preliminary discovery on the
following issues: (1) the information received by the Plaintiffs
and when they received such information; and (2) the applicability
of the Code of Federal Regulations on which the Plaintiffs relied
in responding to Verizon's initial motion to dismiss. On February
16, 2005, the Court denied Verizon's motion to dismiss without
prejudice, stating that it was premature because the case required
limited discovery and further briefing regarding the status of the
administrative remedy.

On May 20, 2005, the Court held a status conference at which
Verizon's counsel represented that many of the discovery issues
might be resolved once the administrative record was produced.
Thereafter, on June 3, 2005, Verizon produced the administrative
record in this matter.

By then, Verizon turned its focus from the administrative
remedies process to the Plaintiffs' breach of fiduciary duty claim.
Specifically, on June 2, 2005, it moved for partial judgment on the
pleadings with respect to the breach of fiduciary duty claim

arising from the October, 2003 EISP offer.  On June 14, 2005, the Plaintiffs responded, and on June 27, 2005, Verizon filed its reply.  On August 16, 2005, the Court granted Verizon's motion and dismissed with prejudice the Plaintiffs' breach of fiduciary duty claim.  That decision concluded that the Plaintiffs were not participants in the October, 2003 EISP offer and, therefore, had no standing to assert a breach of fiduciary duty claim with respect to the third EISP offer.  It also concluded that Verizon had no duty to inform the Plaintiffs of an EISP that had not yet been offered when they retired.

On August 26, 2005, the Plaintiffs requested that the Court reconsider and alter or amend its August 16th Order and deny Verizon's motion for partial summary judgment.  On September 16, 2005, the defendants responded to the Plaintiffs' motion for reconsideration, and the Plaintiffs filed their reply brief on September 30, 2005.  On March 21, 2006, the Court denied the Plaintiffs' motion for reconsideration.  Accordingly, the only claim remaining in this action is the Plaintiffs' claim for severance benefits under the July, 2003 EISP offer.

In a June 21, 2006 Amended Order, the Court determined that the applicable standard of review in this case is a modified abuse of discretion standard because the VCRC operated under a potential

8

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

conflict of interest, as the ISP is unfunded and benefits are paid

by Verizon's general assets.  Shortly thereafter, on July 18, 2006,

Verizon filed a summary judgment motion.  The Plaintiffs responded

on August 22, 2006, and Verizon filed a reply on September 6, 2006.

Accordingly, Verizon's summary judgment motion is ripe for review.

### III.    RELEVANT PLAN PROVISIONS

The ISP[2] "covers regular full-time and part-time, non-salaried

employees of Participating Companies who are represented for

collective bargaining purposes by the CWA or IBEW, and who have at

least one (1) year of 'net credited service[3]'..." (Saunders at

516);(Rogers at 501.)   Section 2.2.1 defines "Eligible Employees"

as covered employees who meet all of the conditions described in

---

[2]  As they did in their prior briefs concerning the applicable standard of
review, the Plaintiffs note that the ISP plan document contained in their
respective administrative records indicate that it is a working draft awaiting
final review by the Plan Administrator and by the Unions.  The plan document,
however, states that it was effective as of January 1, 2001.  (Saunders at 512);
(Rogers at 497.) Furthermore, the SPD for the ISP states that it is based on the
ISP provisions effective January 1, 2001. (Saunders at 525);(Rogers at 512.)
Moreover, Verizon confirms in footnote 1 of their reply brief that plan document
contained in the administrative record is the governing plan document for the ISP
effective January 1, 2001 and states that all terms set forth therein are
accurate. Therefore, the Court finds that the ISP plan document contained in the
Plaintiffs administrative records is the governing plan document in this case.

[3]  "For purposes of computing the amount of ISP or EISP Benefits and the
maximum amount of the ISP Expense Allowance, a Participant's "net credited
service" shall be equal to the Participant's years of net credited service for
retirement eligibility purposes under the Verizon Pension Plan for Mid-Atlantic
Associates, rounded to the nearest one-twelfth (1/12) of the year." (Saunders
at 519);(Rogers at 504.)

Section 2.2 who may qualify as a "Participant" under the ISP. (Saunders at 516);(Rogers at 501.)

Section 2.2.2 of the ISP states:

> A Participating Company will, under the circumstances described in Section 2.2.3 ("Force Surplus"), accept one (1) or more of the applications of Eligible Employees to voluntarily separate from service in exchange for benefits under this Plan. In such a case, the Participating Company will accept only the number of applications that the Participating Company determines is necessary to relieve a declared force surplus condition. Applications will be accepted in seniority order, based on the Eligible Employee's net credited service date, as defined in Section 3.4.1 ("Definition") and Section 3.4.2 ("Part-Time Employment").

(<u>Id</u>.) Section 2.2.3 also states:

> For a Covered Employee to become an Eligible Employee under this Plan, the circumstances described either in Section 2.2.3(a)("Technological Change") or Section 2.2.3(b)("Other Force Surplus") must have occurred at some time prior to the Termination Date (as defined in Section 4.8 ("Amendments and Termination").)

(<u>Id</u>.)

Particularly relevant to this action, Section 2.2.3(b) describes an "Other Force Surplus" as follows:

> The Covered Employee's Participating Company must have determined that a force surplus exists which necessitates any of the actions described in Section 2.2.3(a) ("Technological

<u>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

> Change") for the Covered Employee's job title
> and work location for reasons other than
> technological change; and the Participating
> Company must have deemed it appropriate to
> offer benefits under this Plan to Eligible
> Employees with a job title and a work location
> that are subject to the declared surplus.

(<u>Id</u>.)

Furthermore, Section 2.2.4 provides Verizon with "the sole discretion to determine the one (1) or more job titles and work locations in which a surplus exists, the number of employees in each title and location who are considered to be surplus, and the period during which Eligible Employees may separate from service with benefits. . . ." (Saunders at 516-17);(Rogers at 501-02.) Section 2.2.4 further states that the number of employees whose applications are accepted shall not exceed the number of employees determined to be surplus. (<u>Id</u>.)

To receive benefits under the Plan, an Eligible Employee, who has applied and been accepted, must separate from service on the date, and in the manner, specified by the Company's correspondence with the "Eligible Employees." (<u>Id</u>.) Section 2.3.2 defines "Participant" as an "Eligible Employee" who has been accepted and who has separated from service as described in Section 2.3.1. (<u>Id</u>.)

Also, significant to this action, Section 2.4.1 describes EISP benefits as "other circumstances  in which a covered employee may

receive benefits." (<u>Id</u>.)  Specifically, Section 2.4.1 of the ISP states:

> **Separate Provisions Under Bargaining Agreements**
> The terms of this Plan are supplemented by certain provisions of applicable collective bargaining agreements pertaining to force adjustment, layoff, part-timing, bumping and rehiring after layoff.
>
> Two examples of such provisions are as follows:
> - Prior to proceeding to a layoff resulting from a surplus in any particular title, location, and work group, the Company will offer Enhanced ISP ("EISP") Benefits equal to two (2) times the regular ISP Benefits (e.g., up to a maximum of $66,00), in the surplus title and location.  The Company may also offer EISP in other circumstances if it chooses to do so (IBEW), or when the Income Security Plan may be offered (CWA).  The Company may set limits on the number of ISP applications it is willing to accept, and this EISP offer would be in lieu of obligations, if any, the Company may have to offer regular ISP benefits.

With respect to the amount of EISP benefits provided under the ISP, Section 3.1.2 provides that EISP benefits are $2,200, less withholding taxes, for each completed year of net credited service for a maximum of 30 years. (Saunders at 518);(Rogers at 503.)

Section 4.1 of the ISP expressly states that the Verizon Employee Benefits Committee ("VEBC") is the Plan Administrator and that the Chairperson of the Committee "shall have the authority and

responsibility of overseeing the administration of the plan. (Saunders at 520);(Rogers at 505.) Section 4.2 states that the "Committee's Chairperson shall have full discretionary authority to administer the Plan in all of its details, subject to applicable requirements of law. (<u>Id</u>.) The Chairperson's powers include, but are not limited to, making and enforcing rules and regulations as it deems necessary or proper for the efficient administration of the ISP, construing and interpreting the ISP's provisions, making factual determinations under the provisions of the ISP, and enforcing the ISP in accordance with the terms of the plan and the rules and regulations adopted by the VEBC. (<u>Id</u>.)

Similarly, Section 4.3 states that "[t]he Claims Administrator has sole authority to exercise discretion in the resolution of claims under the Plan," and "[t]he Appeals Administrator has the sole authority to exercise discretion in the review and resolution of any initial appeal of a denied claim under the Plan." (Saunders at 521-22); (Rogers at 506-07.) Claim and Appeals Administrators have full discretion and authority to interpret the ISP based on its provisions, make factual determinations about claims arising under the ISP, determining whether a claim is eligible for benefits, deciding the amount, form, and timing of benefits, and

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

resolving any other matter under the Plan that is raised by a Participant. (_Id_.)

Section 4.4 of the ISP provides the process of filing a claim and claims review. (_Id_.)[4] The ISP states that claims for benefits under the Plan must be submitted to the Claims Administrator in writing along with any supporting documentation. (_Id_.) It further states that, if any claim for benefits is denied, the Claims Administrator must promptly provide written notice advising the claimant of the specific reason for denial, the specific ISP provisions on which the denial is based, the description of any additional information necessary for perfection of the claim, and providing an explanation of the next step in the administrative review procedure. (_Id_.) Section 4.4 also advises that an initial

---

[4]　With respect to filing a claim for benefits, the SPD for the ISP states:

> **Filing a Claim**
>
> You have the right under the Employee Retirement Income Security Act of 1974 (ERISA) and its subsequent amendments to file a claim if you believe you are entitled to benefits and benefits have been denied or incorrectly determined under the Plan.
>
> To submit a claim, put your concern in writing, explaining in your own words your understanding of your benefit issue and provide any supporting information in writing to the claims administrator at the address on page 22....

(Saunders at 541);(Rogers at 526.)

appeal of a denied claim shall be filed with the Appeals Administrator.[5] (<u>Id</u>.)

## IV. STANDARD OF REVIEW

**A. Summary Judgment**

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). In considering a motion for summary judgment, the court is required to draw reasonable inferences from the facts in a light most favorable to the nonmoving party. <u>Id.</u> at 255.

Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex Corp. v. Catrett</u>,

---

[5] The SPD for the ISP also describes in detail the process of filing an appeal after receiving a denial of a claim or after failing to receive timely notice of a decision on a claim. (Saunders at 542);(Rogers at 527.) It advises that an appeal must be submitted in writing to the VCRC within 60 days after the employee receives a denial or fails to receive a timely notice of a decision. (<u>Id</u>.)

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

477 U.S. 317, 322 (1986).  To discharge this burden, the nonmoving party cannot rely on its pleadings but instead must have evidence showing that there is a genuine issue for trial.  <u>Id.</u> at 324.

**B. ERISA Standard of Review**

As set forth in its June 21, 2006 Amended Order, the Court will review the denials of the Plaintiffs' claims for EISP benefits under a modified abuse of discretion standard.  Under this standard, a plan administrator's decision is not disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently.  <u>Smith v. Continental v. Paul Revere Life Ins. Co.</u>, 228 F.3d 518, 522 (4th Cir. 2000).  A decision is reasonable if it is the result of a deliberate, principled reasoning process and is supported by substantial evidence.  <u>Ellis v. Metropolitan Life Ins. Co.</u>, 126 F.3d 228, 232 (4th Cir. 1997).

Because the ISP here is unfunded, however, the plan administrator is operating under a potential conflict of interest, and the Court must also weigh that conflict in determining whether there has been an abuse of discretion.  <u>Booth v. Walmart Stores, Inc. Assocs.  Health & Welfare Plan</u>, 201 F.3d 335, 342 (4th Cir. 2000).  Under this modified review scheme, the Court does not deviate from the abuse of discretion standard, but, instead, modifies it according to a sliding scale.  <u>Ellis</u>, 126 F.3d at 233.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Court must lessen the deference normally given under the abuse of discretion standard to the extent necessary to counteract any influence unduly resulting from the conflict.  <u>Id.</u>

## V.  ANALYSIS

In their summary judgment motion, Verizon asserts that the Plaintiffs' claim for severance benefits may only be brought against the ISP itself or the plan administrator. Thus, they assert that they are not proper defendants in this action.  In the alternative, Verizon argues that, under the modified abuse of discretion standard, the denial of severance benefits to the Plaintiffs should be upheld because the denial is supported by substantial information in the administrative record and no abuse of discretion has occurred.

**A.  Proper Defendant for ERISA Action**

As grounds for its argument that the Plaintiffs' claims for severance benefits under ERISA must be brought against the benefits plan itself or the plan administrator and not the employer or plan sponsor, Verizon cites to footnote eight in an unpublished opinion by the Fourth Circuit Court of Appeals, <u>Gluth v. Wal-mart Stores, Inc.</u>, 117 F.3d 1413, *6 n. 8 (4th Cir. 1997), as well as two district court opinions, <u>Hall v. Tyco Int'l Ltd.</u>, 223 F.R.D. 219, 234 (M.D.N.C. 2004) and <u>Williams v. UNUM Life Ins. Co.</u>, 250

_____
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
_____

F.Supp.2d 641, 645-46 (E.D.Va. 2003), that rely on <u>Gluth</u> for that proposition. Significantly, since early 2004, Verizon has actively defended this case on the issues of the Plaintiffs' alleged failure to exhaust their administrative remedies, the Plaintiffs' lack of standing to pursue their claim for breach of fiduciary duty, and the proper standard of review for the Plaintiffs' claim for severance benefits. Despite its significant motion practice throughout the pendency of this litigation, Verizon never moved to dismiss on the basis of failure to sue the proper parties until this summary judgment motion. Consequently, the Court finds that, at this late date, Verizon has waived any argument to dismiss on the ground that the proper parties are not before the Court. <u>Gluth</u>, 117 F.3d at *6 n 8 ("[B]ecause Walmart proceeded in the litigation without moving for dismissal on that basis, Walmart waived its right to challenge. . . ."); <u>see</u> <u>also</u> <u>Eastes v. Verizon Communications</u>, 2005 WL 483369, *4 n.1 (S.D.W. Va. 2005).

**B. Denial of Severance Benefits Under the ISP**

In <u>Booth v. Walmart Stores, Inc. Assocs. Health & Welfare Plan</u>, 201 F.3d at 342-43, the Fourth Circuit provided guidance on how to conduct an inquiry concerning the reasonableness of a plan administrator's decision. The Court may weigh several factors, including:

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

> (1) the language of the plan; (2) the purposes
> and goals of the plan; (3) the adequacy of the
> materials considered to make the decision and
> the degree to which they support it; (4)
> whether the fiduciary's interpretation was
> consistent with other provisions in the plan
> and with earlier interpretations of the plan;
> (5) whether the decisionmaking process was
> reasoned and principled; (6) whether the
> decision was consistent with the procedural
> and substantive requirements of ERISA; (7) any
> external standard relevant to the exercise of
> discretion; and (8) the fiduciary's motives and
> any conflict of interest it may have.

_Id._ While a district court may consider any additional factors
from _Booth_ that it deems relevant, it need not consider any of the
eight factors that the parties do not implicate through their
arguments. _Scipio v. United Nat'l Bankshares, Inc._, 284 F. Supp.2d
411, 418 (N.D. W. Va. 2003)(citing _Booth_, 201 F.3d at 344).

The Plaintiffs assert that at least four of the _Booth_ factors
are directly at issue in this action. Specifically, they argue
that, in deciding the reasonableness of Verizon's denial of
benefits, the Court should consider: (1) the language of the ISP;
(2) the adequacy of the materials considered to make the decision
and the degree to which the materials support that decision; (3)
whether the decisionmaking process was reasoned and principled; and
(4) the fiduciary's motives and any conflict of interest that it
may have. In reviewing the Plaintiffs' denial of severance

19

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

benefits, therefore, the Court will focus on these four factors with respect to the issues raised by the parties.

**1. The Language of the ISP**

Verizon asserts that the denial of the Plaintiffs' claims for severance benefits was consistent with the express language of the ISP. Section 2.2.4 of the ISP expressly provides Verizon with the "sole discretion" to determine "the number of the employees in each title and location who are considered to be a surplus." (Saunders at 516);(Rogers at 501.) Utilizing its broad discretion, Verizon determined that there was a surplus of two employees in the Plaintiffs' job title and work location. (Rogers at 64.) However, there were five Consultants at the Clarksburg work location who applied for EISP benefits during the volunteer period. (Saunders at 141); (Rogers at 64.) Accordingly, pursuant to Section 2.2.2 of the ISP, Verizon accepted the applications of the two Clarksburg Consultants with the most seniority. (Saunders at 133, 516);(Rogers at 69, 501.) Therefore, Verizon argues that it properly accepted EISP applications in accordance with the provisions of the ISP.

The Plaintiffs, however, contend that the June, 2003 EISP was improper because the ISP does not authorize a "Surrogate EISP." They contend that Verizon considered whether the position of the eligible employees could be backfilled in determining the number of

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

employees in their job title and work location considered to be surplus because the June, 2003 EISP was a "Surrogate EISP." The Plaintiffs argue that neither the ISP nor the SPD for the ISP provides for a "Surrogate EISP." Accordingly, they claim that their denial of benefits is contrary to the plain language of the ISP because the denial arose from a surplus determined through a "Surrogate EISP."

The VCRC's March 14, 2005 denial letters to the Plaintiffs explain:

> Under surrogate EISP offers, bargaining units
> canvassed employees to gauge the level of
> interest among the employees in an EISP offer.
> The bargaining units provided lists of
> interested employees to Verizon. Verizon
> solicited elections from all of the interested
> employees. Unlike regular EISP offers, only
> then did Verizon determine the one or more job
> titles and work locations in which a surplus
> existed, and the number of employees in each
> job title and work location who were
> considered surplus. As under regular EISP
> offers, the primary consideration in this
> determination was whether the needs of the
> business could still be met if an interested
> employee in a particular job title and work
> location were to leave the service of Verizon.
> However, unlike under regular EISP offers,
> when making this determination Verizon
> considered whether the position of an
> interested employee in a particular job title
> and work location could be "backfilled."
> "Backfilled" means that a qualified associate
> (i.e., another employee in the same job title
> and within a certain geographical radius of an
> interest employee's work location) could be

> reassigned to fill the interested employee's position if the interested employee's application were accepted and they were to leave service of Verizon under the offer. Unlike under regular EISP offers, Verizon could offer EISP benefits to interested employees if their positions could be "backfilled." As under regular EISP offers, Verizon had the sole discretion under surrogate EISP offers to determine whether a surplus existed in a particular job title and work location.

(Saunders at 4);(Rogers at 4.)  Based on the VCRC's explanation, the Court agrees with Verizon that the defining feature of the "Surrogate EISP" is only how Verizon determines the number of surplus positions in a particular job title and work location.

The Plaintiffs do not dispute that Section 2.2.4 of the ISP states that Verizon has the sole discretion to determine the number of employees in each title and location who are considered to be surplus.  (Saunders at 516-17);(Rogers at 501-02.)  Furthermore, the SPD for the ISP utilizes virtually identical language setting forth the broad discretion of Verizon in determining the surplus for EISP purposes. (Saunders at 530);(Rogers at 515.)  Moreover, the June, 2003 EISP Offer documents reenforce that Verizon has the sole discretion to determine the "number of surplus associates in each job title and Force Adjustment Area or Involuntary Transfer Area."  (Saunders at 35);(Rogers at 34.)

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Clearly, the ISP does not impose any duty on Verizon to use one specific method to determine the number of employees considered to be surplus. Rather, the provisions of the ISP, the SPD for the ISP, and the June, 2003 EISP Offer documents unambiguously establish that the determination of surplus is solely within the discretion of Verizon. Accordingly, no provision in the ISP prohibits the use of a "Surrogate EISP." Therefore, no evidence exists in the administrative record to demonstrate that Verizon's denial of benefits based on a "Surrogate EISP" was inconsistent with the express language of the ISP.

2. **The Adequacy of the Materials Considered to Make the Decision and the Degree to Which the Materials Support that Decision**

The Plaintiffs further assert that there is no documentation in the administrative record demonstrating that Verizon declared a "Surrogate EISP" in June, 2003. They argue that the only references to the "Surrogate EISP" were contained in internal documents that were only disclosed as a result of this lawsuit.

As stated above, no provision of the ISP or the SPD for the ISP requires Verizon to disclose the method used in determining the surplus. Moreover, the Plaintiffs have failed to explain how Verizon's alleged failure to disclose that the June, 2003 EISP was

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

a "Surrogate EISP" demonstrates that the denial of severance benefits to them was an abuse of discretion.

The only aspect of a "Surrogate EISP" that distinguishes it from a regular EISP is how Verizon determines the number of surplus positions in a particular job title and job location. Specifically, in a "Surrogate EISP, the bargaining units poll the employees to determine the level of interest with respect to the EISP offer and then provide lists of the interested employees to Verizon. Thus, here, when Verizon initially informed its employees that there would be a second EISP in 2003, it clearly suggested that the June, 2003 EISP would be a "Surrogate EISP" because the e-mail indicated that a voluntary separation offer would be extended to additional eligible associates, "*including those on a list of potential volunteers identified by the union.*" (Rogers at 63)(emphasis added.)   Therefore, materials contained in the administrative record establish that Verizon did not conceal from its employees the fact that the June, 2003 EISP was a "Surrogate EISP."

According to the Plaintiffs, the materials in the administrative record also do not support Verizon's determination of the relevant job title and work location applicable to them for the June, 2003 EISP offer.  Rather, they claim that the specific

job titles selected for the June, 2003 EISP Offer included Consultant, General Clerk, Office Clerk, Service Order Administrator, and Telemarketing Representative. (Rogers at 69-70;71-72.)  They further assert that the work locations in which the various job titles were located were determined by the names of the seven Regional Directors.  (Rogers at 69.)

Accordingly, the Plaintiffs claim that 26 employees in Mary Welsh's work group applied for EISP benefits, that 15 surplus positions existed in that work group and that they ranked fifth and eighth on the list of applicants in terms of seniority. (Rogers at 69-70.)  Therefore, they reason that Verizon "quite arbitrarily" denied EISP benefits to the first 11 employees listed in Mary Welsh's work group, rather than accept EISP volunteers in order of seniority.

The Plaintiffs primarily rely on two charts summarizing the results of the June, 2003 EISP for the Potomac area by the Vice President, Regional Vice President and Director.  (Rogers at 71-72.)  Were the Court to adopt Plaintiffs' determination of the relevant job title based on these charts, it would include not only Consultants, but also General Clerks, Office Clerks, Service Order Administrators, and Telemarketing Representatives.  Similarly, the Plaintiffs' definition of the relevant work group includes six

different Verizon offices in two different states (i.e.,
Charleston, West Virginia; Clarksburg, West Virginia, Falls Church,
Virginia; Richmond, Virginia; Roanoke, Virginia; and Virginia
Beach, Virginia).  Nowhere do the Plaintiffs explain how these
charts clearly establish that the work group applicable to them for
the June, 2003 EISP included five separate job titles and six
different Verizon offices rather than the more limited work group
of Consultants at the Clarksburg, West Virginia Verizon office
determined by Verizon.

The Plaintiffs also improperly rely on a summary chart
entitled "Mid Atlantic- Potomac Surrogate Preliminary Final List of
Volunteers- 7-16-03" to argue that the relevant work location was
the Mary Welsh work group and the relevant job title was "Retail
Marketing Sales and Operations. (Rogers at 69-70.)  The summary
chart, however, clearly identifies each employee by their specific
job title (i.e.- Consultant), their specific job location (i.e.-
Verizon Office at 425 Holden, Clarksburg, WV), as well as their
Director.  Once again, however, the Plaintiffs fail to explain how
this chart supports their definition of the relevant work group
rather than that determined by Verizon.

Although the Plaintiffs couch their argument in terms of the
alleged lack of materials in the administrative record to support

26

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Verizon's determination of the work group applicable to them for the June, 2003 EISP, it is their personal disagreement with Verizon's definition of the relevant job title and work location that is at the heart of their argument. Section 2.2.4 of the ISP, however, provides Verizon with the "sole discretion" to determine the "the one or more job titles and work locations in which a surplus exists." (Saunders at 516-17);(Rogers at 501-02.) Accordingly, Verizon's determination that the work group applicable to the Plaintiffs was Consultants at the Clarksburg, West Virginia Verizon office was completely within its discretion.

When considering the administrative record in light of Verizon's determination that the relevant work group included only Consultants at the Clarksburg, West Virginia Verizon office, it is clear that five Consultants applied for the EISP benefits in June, 2003. (Saunders at 141);(Rogers at 94). Under the broad discretion given to it in Section 2.2.4 of the ISP, Verizon determined that there was a surplus of two employees in that work group. Accordingly, pursuant to Section 2.2.2 of the ISP, it accepted the applications of the two Clarksburg consultants with the most seniority.[6] (Saunders at 133, 516);(Rogers at 69, 501.)

---

[6] Specifically, Verizon accepted the applications of the two employees whose "Net Credit Service" dates were April 28, 1972 and May 29, 1972. (Saunders at 133);(Rogers at 69) Plaintiffs Saunders and Rogers, in comparison, had "Net Credited Service" dates of March 28, 1973 and July 10, 1973, respectively. (<u>Id</u>.)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Significantly, the Plaintiffs do not dispute that the EISP benefits were properly granted to employees in order of their seniority when divided into the Clarksburg, West Virginia Consultant work group.

Although the Plaintiffs assert that Verizon improperly accepted applications for the June, 2003 EISP from less senior employees, the evidence in the administrative record simply does not support their argument. Therefore, considering that the administrative record contains numerous charts summarizing the results with respect to the relevant job title of Consultant and the relevant work location of Clarksburg, West Virginia, the Court concludes that the evidence weighed by Verizon substantially supported its benefits decision.[7]

---

Another Clarksburg Consultant who had a Net Credited Service date of January 30, 1978 was also not accepted for the EISP benefits offered in June, 2003. (_Id._)

[7]   Section 2.3.1 of the ISP specifically states that, to receive benefits, an "Eligible Employee" who application has been accepted to participate in the plan "must separate from service on the date, and in the manner specified by the Company . . . in its correspondence with the "Eligible Employee." (Saunders at 517);(Rogers at 502).  Because the Plaintiffs' applications were not accepted by Verizon in accordance with Section 2.2.2 of the ISP, the Court need not address in detail Verizon's argument with respect to the Plaintiffs' failure to separate on the date required by the ISP.

However, the June, 2003 EISP offering documents unambiguously stated that if an employee volunteered to leave under the terms of the EISP offer and was accepted, his last day on active payroll would be July 26, 2003. (Saunders at 21);(Rogers at 20.) The administrative record establishes that Saunders' last day of work was July 18, 2003 and Rogers' last day of work was July 25, 2003. (Saunders at 68);(Rogers at 61).  ERISA requires courts to strictly enforce the terms of the benefits plans and administrators are bound by the language of the plan.  Gallagher v. Reliance Std. Life Ins. Co., 305 F.3d 264, 276 n.11 (4th Cir. 2002).  Therefore, the Plaintiffs' separation was not in accordance with the terms of the ISP.

### 3.  A Reasoned and Principled Decisionmaking Process

Ordinarily, a "Surrogate EISP" is more expansive in scope than a regular EISP, and, therefore, more beneficial to interested employees.  Accordingly, the Plaintiffs' claim that the ISP does not provide for the "Surrogate EISP," and, therefore, they were harmed by the "Surrogate EISP" is illogical.  Rather, the VCRC's conclusion that the provisions of the ISP allow for a "Surrogate EISP" is reasonably based on the broad discretion given to Verizon to determine the surplus in specific job titles and work locations.

Furthermore, the Plaintiffs' argument that the relevant job title should be "Retail Marketing Sales and Operations" and the relevant work location should be the "Mary Welsh Work Group" has no reasonable basis when considering that the purpose of the ISP. Specifically, the ISP was designed to provide severance benefits to those eligible employees who accepted a voluntary offer to separate from employment to assist the company in reducing or eliminating a surplus in specific job titles and work locations. As stated earlier, the "Mary Welsh Work Group" proposed by the Plaintiffs included five different job titles and six different work locations.

Verizon correctly points out that, if the Court were to adopt the Plaintiffs' argument of grouping several job titles, Verizon

could potentially be left with no change in one or more positions
while left with a shortage in other positions that had been
occupied by more senior employees.    Similarly, if the Court were
to adopt the Plaintiffs' contention that various work locations
should have been grouped together, Verizon could potentially face
a situation where one city would experience an employee shortage
due to a large number of senior employees while other offices would
be left unaffected.    Accordingly, the VCRC's interpretation of
"work group" as a specific job title at a specific Verizon office
is reasonably based on the purpose of the ISP.

       In sum, the Plaintiffs have failed to cast doubt on the
propriety of Verizon's decisionmaking process.    Therefore, the
Court finds that Verizon arrived at their claim decisions in a
reasoned and principled manner.

       **4.  Conflict of Interest**

       Relying on In _Colucci v. Agfa Corp. Severance Pay Plan_, 431
F.3d 170, 179-80 (4th Cir. 2005), cert denied, 126 S.Ct. 2300
(2006), Verizon argues that the potential conflict arising because
the ISP is unfunded and benefits are paid from the general assets
of Verizon should not substantially affect the Court's deference to
the plan administrator's decision.    In Colucci, the Fourth Circuit
stated that the fact the plan's administrator is also its funder is

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

not enough to support a finding of a conflict of interest that would cause an adjustment to the deference provided to the administrator.  Rather, it indicated that a conflict of interest might occur when a plan is managed by its insurer whose revenue comes from fixed premiums paid by the plan's sponsor. <u>Id.</u>

The Fourth Circuit stated in <u>Colucci</u> that "[t]here is a material difference . . . between a corporation whose business profits primarily derive from managing ERISA plans and a corporation that collaterally manages a plan through which it chooses to provide its employees with benefits." <u>Id.</u>  It further stated that "[w]hen a company sponsors a plan and then administers it, the fact that the benefits cost money is insufficient to support the presumption of a conflict; that cost is the product of its election to provide the employees with benefits."  It also noted that the bare fact that the plan sponsor's employees sit on the review committee or are the plan administrator does not alone establish improper motives.  <u>Id.</u>

The Plaintiffs, however, assert that Verizon not only funds and permits its employees to administer the ISP, but also improperly denied EISP benefits to numerous other employees and did not consider their claims for benefits until after suit was filed.

31

Therefore, they argue that the VCRC's decision was not free from influence.

The Court has already determined that no abuse of discretion arises from Verizon's determination that the relevant work groups for the June, 2003 EISP were specific job titles at specific work locations.  Therefore, because it relies on their definition of the relevant work groups (i.e.- Mary Welsh Group), the Plaintiffs' argument that other employees were also improperly denied severance benefits is without merit.

Furthermore, as it fully addressed in its June 21, 2006 Amended Order concerning the applicable standard of review, the June, 2003 EISP offering documents put the Plaintiffs on notice that the claims and appeals procedure set forth in the ISP and SPD for the ISP applied to that offer.  Specifically, the June, 2003 EISP offer letter states:

> This document was prepared to provide the reader with a brief summary of the plans and benefits regarding the Income Security Plan. All rights and/or obligations under the Income Security Plan will be governed by the collective bargaining agreements, and plan descriptions covering that benefit.

Despite this notice, the Plaintiffs, and ultimately counsel for the Plaintiffs, refused to submit their claims to the VCRU in accordance with the provisions of the ISP and the SPD for the ISP.

<u>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

As a result, the Claims Administrator did not consider the Plaintiffs' claims for benefits until after this lawsuit was filed. In point of fact, Verizon ultimately submitted the Plaintiffs' Complaint to the VRCU and the Claims Administrator for review as claims for benefits by the Plaintiffs.

Moreover, at every step in the administrative process, Verizon thoroughly articulated the reasoning undergirding its decision and welcomed new evidence that could prompt reevaluation of the claim. Therefore, the Court finds that Verizon's conflict of interest does not detract from the reasonableness of its claim decision.

**5. Summary**

After carefully weighing the evidence in the administrative record and the rationale proffered by Verizon, the Court finds that Verizon's claim decision is the product of deliberate and principled reasoning, is supported by substantial evidence, and is consistent with the express language of the ISP. The Court further finds that Verizon's conflict of interest had no undue influence on the decision. Accordingly, the Court concludes that Verizon did not abuse its discretion in denying severance benefits to the Plaintiffs.

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

### VI. CONCLUSION

For the reasons discussed, the Court **GRANTS** Verizon's motion for summary judgment (dkt no. 72). Accordingly, the Court **DISMISSES WITH PREJUDICE** the Plaintiffs' complaint from the docket.

It is so **ORDERED**.

The Clerk is directed to transmit a copy of this Order to counsel of record.

DATED: March 28, 2007.


/s/ Irene M. Keeley
IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE